UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

                Plaintiff,              CR. NO.  07-20369

    v.

                                    HON. VICTORIA A. ROBERTS

ROGER JUNIOR SWEET,

                Defendant.

_____/

SUPPLEMENTAL BRIEF IN SUPPORT OF MR. SWEET'S
PRO SE MOTION FOR COMPASSIONATE RELEASE

## I.    Introduction

It seems unimaginable that in less than 12 months, more than 471,000 people in the United States have died as a result of COVID-19.  The virus has swept through jails and prisons, including FCI Milan, where Mr. Sweet is detained.  The basic steps relied on by the general public to stem the spread – social distancing, routine mask wearing, frequent hand washing and disinfection – are difficult if not impossible to adhere to in a custodial setting.  Mr. Sweet knows first-hand the impact of COVID-19.  In April of 2020, at the age of 72 years old, he was diagnosed with the virus.  He became very ill and was ultimately hospitalized to address a cardiac issue – atrial fibrillation – that developed as a result of COVID.  His pre-existing conditions – chronic kidney disease

1

("CKD"), a history of smoking, and now a cardiac history – make him more vulnerable to COVID -19 than the average person should he become re-infected with the virus. Mr. Sweet's underlying health conditions, his age, and the conditions of his confinement render the circumstances "extraordinary and compelling."  He moves this Court, pursuant to the First Step Act of 2018 and 18 U.S.C. § 3582(c)(1)(A)(i), to reduce the remainder of his term of imprisonment to time served, and to impose a special condition that he serve a period of home confinement on supervised release.  This will allow him to serve the remainder of his sentence on home confinement, which will protect him, the staff and inmates at FCI Milan, and the community from the spread of COVID-19.

Since last spring, 3 inmates at FCI Milan have died of the rapidly spreading COVID-19 infectious disease.  There are currently 8 positive cases within the inmate population, and 255 inmates have "recovered."[1]   Mr. Sweet's federal sentence began to ran January 11, 2007 (ECF No. 22, PageID.154).  He has served over 14 years (168 months) in custody.  This amounts to 64% of his 262-month sentence.  He reports no disciplinary issues while in custody, and has a solid release plan in place.

---

[1] https://www.bop.gov/coronavirus/   As of February 11, 2021, BOP reports that among staff members at Milan, there are four individuals currently positive for the virus, while 76 staff members have "recovered" from the virus.

2

Undersigned counsel attempted to seek concurrence in this Motion. AUSA Kevin Mulcahy declined to concur in the relief sought.

## II.    Case Background

On April 7, 2008, Roger Sweet pleaded guilty to four counts of Sexual Exploitation of Children (Counts 1-4 of the Indictment) and one count of Attempted Receipt of Child Pornography (Count 5 of the Indictment). His guilty plea was pursuant to a written Rule 11 plea agreement, ECF No. 23, PageID 71. The basis for Mr. Sweet's guilty pleas to Counts 1-4, as set forth in the Rule 11, was his repeated use and or persuasion of a minor victim (V-1) to engage in sexually explicit conduct, for the purpose of producing a visual depiction of the conduct. This events occurred between July 1, 2004 and June 26, 2005. With respect to Count 5, Mr. Sweet admitted to attempting to download child pornographic materials from a website operated outside of the United States. <u>See,</u> ECF No. 23, PageID 74.

The Rule 11 contained a stipulated guideline range of 210 to 262 months, and included a commitment by the Government to recommend that the federal sentence run concurrent to sentences for cases then pending in Oakland County and Wayne County.[2] <u>See</u>, ECF No. 23, Rule 11 Plea Agreement, PageID. 76. The Rule 11 also

---

[2] Mr. Sweet had been in custody on the Wayne County case since January 11, 2007. He was initially charged in Wayne County (07-005651) with multiple counts of Criminal Sexual Conduct and multiple counts of Child Sexually Abusive Commercial Activity. <u>See</u>, Exhibit A, Register of Actions from Case No. 07-005651-01. He pleaded guilty to

included a commitment by the Government to work with the Wayne County Prosecutor's Office and the Oakland County's Prosecutor's Office to secure the transfer of Mr. Sweet from state custody to federal custody, such that he would serve his federal sentence first, and then transfer to state custody to serve any remaining state sentence.  See, ECF No. 23, Rule 11 Plea Agreement, PageID. 76.

The Presentence Investigation Report ("PSR") calculated a range of 262 to 327 months, after adding a 2 level upward adjustment because the victim qualified as a "vulnerable victim" pursuant to U.S.S.G. § 3A1.1(b)(1).   Other than the cases in Oakland and Wayne Counties discussed above, Mr. Sweet did not have any prior criminal history that generated criminal history points.  The PSR noted that at the time of the report, Mr. Sweet was under medical care for chronic pain and gastroesophageal reflux disease.  Additionally, in May 2008 he underwent stomach surgery.  Id., ¶ 68.

This Court ultimately sentenced Mr. Sweet to 262 months in the instant case (R. 130, Judgment).  Mr. Sweet was not transferred to federal custody following the

---

one count of CSC- 1st (Multiple Variables) and was ultimately sentenced to 10 years to 17 years in prison, to run concurrent to his cases in Oakland County and Federal Court. The victim in Wayne County case was the same victim in the Federal Case.  See, PSR ¶ 9, 50.

During this same time period, Mr. Sweet was charged in Oakland County Circuit Court with the murder of his first wife.  PSR ¶ 52.  He ultimately pleaded Nolo Contendre to Homicide – Murder, 2nd Degree, and was sentenced on November 25, 2008, to 15 to 30 years in custody, concurrent to his Wayne County sentence and "to be served in Federal Prison."  See, Ex. B – Judgment of Sentence, People v. Sweet, Case No. 07-216675.

resolution of his cases.  Instead, he served an additional 12 years in the Michigan Department of Corrections ("MDOC"), and was transferred into Bureau of Prisons ("BOP") custody on May 15, 2019.  His current release date appears to be December 22, 2037.  See, Ex C – Public Information Inmate Data.  It is anticipated that BOP will calculate a new release date within the next few weeks, based on the Amended Judgment recently entered by the Court.  See, Amended Judgment, ECF 33, PageID.152.

In early December 2020, Mr. Sweet filed a request for compassionate relief with prison staff.  That request was officially denied on January 15, 2021.  See, Exhibit D, Warden's Denial.

## III.  Legal Standard for Compassionate Release

Federal courts may reduce a prisoner's sentence under the circumstances outlined in 18 U.S.C. § 3852(c).  Pursuant to § 3582(c)(1)(A)(i), a court may reduce a prisoner's sentence upon a finding that (1) "extraordinary and compelling reasons warrant such a reduction" and (2) the reduction is "consistent with applicable policy statements issued by the Sentencing Commission."  Prior to 2018, only the Director of the Bureau of Prisons ("BOP") could file these "compassionate release" motions.

The passage of the First Step Act, in 2018, significantly changed 18 U.S.C. § 3582 by allowing defendants to directly petition courts for relief instead of leaving relief decisions solely with the BOP. 18 U.S.C. § 3582(c)(1)(A).  This removed the BOP's exclusive role as "gatekeeper" in compassionate release cases.  "The First Step was

passed against the backdrop of a documented infrequency with which the BOP filed motions for a sentence reduction on behalf of defendants." <u>United States v. Redd,</u> No. 1:97-CR-00006-AJT, 2020 WL 1248493, at *7 (E.D. Va. Mar. 16, 2020). The compassionate release statute, as amended by the First Step Act, authorizes district courts to grant relief whenever "extraordinary and compelling reasons" warrant a reduction, consistent with the sentencing factors outlined in 18 U.S.C. § 3553(a) and the Sentencing Commission's applicable policy statements—regardless of the BOP's position.

The statutory responsibility to decide whether to extend compassionate release to Mr. Sweet rests solely with the Court. "Until the Sentencing Commission updates § 1B1.13 . . ., district courts have full discretion . . .to determine whether 'an extraordinary and compelling' reason justifies a compassionate release when an imprisoned person files a § 3582(c)(1)(A) motion." <u>United States v. Jones</u>, -- F.3d --, 2020 WL 6817488 at *7 (6th Cir., Nov. 20, 2020).

## IV.    Mr. Sweet has Complied with the 30-Day Rule under § 3582(c)(1)

Section 3582(c)(1)(A)(i) generally requires exhaustion of administrative remedies, and gives the Court authority to grant relief to a person moving for compassionate release after "the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility." Mr. Sweet's request for relief was denied by the warden on January 15, 2021. <u>See</u>, Exhibit D, Warden's Denial.

## V.     Argument

### A.     COVID-19 Poses a Unique Risk to Individuals In Custodial Settings.

COVID-19 is a dangerous and unpredictable respiratory illness, the rapid spread of which has resulted in a world-wide pandemic.   To date, 46,701 inmates in the BOP have contracted COVID-19.   While 45,107 inmates are considered to have "recovered" from the illness, at least 220 have died.  See, https://www.bop.gov/coronavirus/index.jsp. (last visited February 11, 2021). The BOP has completed testing of 102,928 prisoners, which is approximately 75% of the total prison population.  Of those tested, more than 44% have been positive for the virus.  *Id*.

Prisons and jails are ill-equipped to prevent the spread of the virus.  The majority of recommended measures to prevent the spread of COVID-19 are impossible to achieve in a prison setting.   Measures such as social distancing, frequently disinfecting shared surfaces, frequent had washing and use of hand sanitizer are simply not available to prisoners.   A research letter published on July 8, 2020,  in the online JAMA Network Journal, specifically addresses COVID-19 cases and deaths in prisons.  That letter states that the COVID-19 case rate for prisoners is "5.5 times higher" than the US population case rate, and that the adjusted death rate in the prison population was "3.0 times higher than would be expected if the age and sex distribution of the U.S. and prison populations were equal."



See, Exhibit E, Brendan Saloner, et al, *COVID-19 Cases and Deaths in Federal and State Prisons*, JAMA Online (July 8, 2020).

**B.    Sweet's Age and Health Conditions Place Him at High Risk of Death or Serious Illness**

*Age*

Mr. Sweet will turn 73 years old next month.  The CDC has explained that the risks of COVID-19 increase with age:

> Among adults, the risk for severe illness from COVID-19 increases with age, with older adults at higher risk.  Severe illness means that the person with COVID-19 may require hospitalization, intensive care, or a ventilator to help them breathe, or they may even die.

8

See, www.CDC.gov, (last checked 2/16/21),
https://www.cdc.gov/coronavirus/2019-
ncov/hcp/faq.html#:~:text=Among%20adults%2C%20the%20risk,the
y%20may%20even%20die.

The risk of severe illness isn't the only COVID complication that increases with age –
a recent report found that age makes a major difference in mortality risk as well.
"Compared with those aged 18 through 29 years, people between the ages of 75 and 84
years and those 85 years or older have 200 times and 630 times greater average death
rates, respectively." See, Exhibit F, Howard K. Koh, MD, MPH, et al, *Death From
COVID-19*, JAMA Online (December 17, 2020). Mr. Sweet's age, along with the health
conditions detailed below place him at increased risk of severe illness and death from
COVID.

### Chronic Kidney Disease

On June 25, 2020, the CDC added chronic kidney disease ("CKD") to the list of
conditions that create an "increased risk" of severe illness from COVID. Mr. Sweet
has been diagnosed with chronic kidney disease, and a Clinical Encounter note from
July 2019 explains that his "GFR" level was 50, which equated to CKD Stage 3. See,
Exhibit H, p. 10. "GFR" stands for Glomerular Filtration Rate, a measurement that
allows for the evaluation of kidney function. The National Kidney Foundation,
https://www.kidney.org/atoz/content/gfr, provides the following graphic to explain
the different stages of kidney disease:

9

| STAGES OF CHRONIC KIDNEY DISEASE | | GFR* | % OF KIDNEY FUNCTION |
|---|---|---|---|
| Stage 1 | Kidney damage with **normal** kidney function | 90 or higher | 90-100% |
| Stage 2 | Kidney damage with **mild loss** of kidney function | 89 to 60 | 89-60% |
| Stage 3a | **Mild to moderate** loss of kidney function | 59 to 45 | 59-45% |
| Stage 3b | **Moderate to severe** loss of kidney function | 44 to 30 | 44-30% |
| Stage 4 | **Severe** loss of kidney function | 29 to 15 | 29-15% |
| Stage 5 | Kidney **failure** | Less than 15 | Less than 15% |

\* Your GFR number tells you how much kidney function you have. As kidney disease gets worse, the GFR number goes down.

An Clinical Encounter note from July 29, 2020 <u>again</u> characterizes Sweet's CKD as Stage 3 (Moderate).[3]  <u>See</u>, Exhibit G, p. 11.  Inexplicably, the following day, his CKD was listed as Stage 1, "stable; good control."  <u>See</u>, Exhibit G, p. 8.  It is difficult to gauge the true extent of Mr. Sweet's CKD, given the inconsistent medical records.  This is particularly true because it does not appear that updated lab tests were conducted to provide an updated GFR level.

What is clear is that it is very important for those suffering from chronic kidney disease to monitor their blood pressure closely, have regular physical activity and a healthy diet.   In <u>United States v. DeBartolo</u>, --F.3d --, 2020 WL 3105032 (D. Rhode

---

[3]  Mr. Sweet's 2020 BOP medical records are attached as Exhibit G.  Counsel has provided page numbers in the lower center area of each page.  Mr. Sweet's 2019 BOP medical records, also numbered, are attached as Exhibit H.

Island. 6/11/20), at * 1,  the Court noted, "[s]everal recent studies of outcomes in COVID-19 patients suggest chronic kidney disease increases risk of mortality, when compared to those without the risk factor," citing to the following studies - Brandon Michael Henry, et al., <u>Chronic Kidney Disease is Associated with Severe Coronavirus Disease 2019 (COVID-19) Infection</u>, 52 Int'l Urology & Nephrology 1193, 1193 (Mar. 28, 2020), https://link.springer.com/article/10.1007/s11255-020-02451-9; also Yichun Cheng, et al., <u>Kidney Disease is Associated with In-Hospital Death of Patients with COVID-19,</u> 97 Kidney Int'l 829-38 (Mar. 20, 2020), https://www.kidney-international.org/article/S0085-2538(20)30255-6/pdf. <u>See</u> also, <u>United States v. Young</u>, 2020 WL 2614745 (W.D. Wash. May 22, 2020) (compassionate release granted based on defendant's age, hypertension and chronic kidney disease).

### *Atrial Fibrillation*

Following Mr. Sweet's COVID-19 diagnosis, he experienced a significant cardiac episode.  He was hospitalized from April 14, 2020 through April 17, 2020, after experiencing hypoxia (oxygen deprivation), respiratory failure and possible pulmonary embolism. <u>See</u>, Ex. G, p. 56, 58.  He was diagnosed with atrial fibrillation, described by the American Heart Association as "a quivering or irregular heartbeat (arrhythmia) that can lead to blood clots, stroke, heart failure and other heart-related complications." <u>See,</u>        https://www.heart.org/en/health-topics/atrial-fibrillation/what-is-atrial-fibrillation-afib-or-af.  He was also diagnosed with a pulmonary embolism, and started on blood thinners.  He remains under medical care for these conditions.

If Mr. Sweet is re-infected with COVID-19, the risks to him given his atrial fibrillation diagnosis are severe. The American Heart Association reported the following findings related about the relationship between COVID-19 and irregular heartbeat:

> Our study suggests that the combination of COVID-19 and atrial arrhythmias may create a pathologic synergy that markedly increases the risk for major adverse cardiac events and death," said Zaniar Ghazizadeh, M.D., a lead author of the study and an internal medicine resident at Yale New Haven Hospital/Yale School of Medicine in New Haven, Connecticut. "COVID-19 places patients at a high risk for abnormal heart rhythms that are, in turn, associated with markedly worse outcomes including death and multi-organ failure. Patients and physicians need to monitor for these arrhythmias closely and treatments needs to be timely.

<u>See</u>, American Heart Association, *Covid-19 risks: Irregular heartbeat may increase risk, blood pressure medicines do not* (November 9, 2020), available at: https://newsroom.heart.org/news/covid-19-risks-irregular-heartbeat-may-increase-risk-blood-pressure-medicines-do-not#.

### Former Smoker

Mr. Smith smoked two packs of cigarettes a day for nearly twenty years. <u>See</u> Ex. H, 2019 Records at p. 21. (noting history of smoking).) Being a former smoker "increases [the] risk of severe illness from COVID-19." CDC, *People with Certain Medical Conditions*, available at https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html#smoking; see also <u>United States v. Staats</u>, No. 17-cr-461, 2020 WL 6888224, at *2 (E.D. Pa. Nov. 24, 2020) (discussing scientific studies animating the CDC's decision to list smoking as a risk factor). Courts have granted compassionate release to incarcerated people with a history of smoking.

See, e.g., id.; United States v. Andrade, No. 16-cr-20751, 2020 WL 5505344, at *2 (E.D. Mich. Sept. 11, 2020); United States v. Khawaja, No. 18-cr-127, 2020 WL 5549123, at *2 (D.N.H. Sept. 16, 2020).

### Prior COVID-19 Diagnosis

Mr. Sweet contracted COVID-19 in April of 2020, and experienced severe cardiac symptoms in the months that followed.  He is still under medical care for conditions that appear to have resulted from COVID-19 infection.  Mr. Sweet's "extraordinary and compelling" situation is not diminished by the fact that he already tested positive for COVID-19. According to the CDC:

> To date, reports of reinfection have been infrequent. Similar to other human coronaviruses where studies have demonstrated reinfection, the probability of SARS-CoV-2 reinfection is expected to increase with time after recovery from initial infection due to waning immunity and possibly genetic drift.

CDC, *Duration of Isolation and Precautions for Adults with COVID-19* ("Key finding" # 5), available at https://www.cdc.gov/coronavirus/2019-ncov/hcp/duration-isolation.html.  And according to an infectious disease expert, "[r]e-infection with SARS-CoV-2 has been documented, with some individuals presenting more severe disease than the first infection. This suggests that at least in some proportion of individual's immunity is not sufficiently protective." See, Exhibit I, Declaration of Dr. Vijayan, ¶ 9 (originally submitted as an exhibit in United States v. Cordova, 19-cr-02453 (S.D.Cal.). The fact that someone recovered from a COVID infection "does not mean

they will recover from a subsequent infection. An individual could survive a first infection and die from a subsequent infection." (*Id.* at ¶ 25.) Because Mr. Sweet lives in a congregant prison setting, re-infection is "more likely." (*Id.* ¶¶ 14, 17.)

A real-world illustration of this point is the case of Ricky Lynn Miller, an inmate who became infected with COVID-19 at FCI Butner Low on June 1, 2020. Mr. Miller tested negative on July 6. On September 9, 2020, he was transferred to a hospital for shortness of breath and leg edema. On September 16, 2020, he tested positive for COVID again. He died the following day. *See* BOP Press Release, *Inmate Death at FCI Butner (Low)* (Sept. 17, 2020).[4]

In light of the uncertainties regarding COVID-19 immunity and how long it lasts, many courts have erred on the side of caution to avoid potentially lethal consequences. <u>See,</u> e.g., <u>United States v. Fields,</u> No. 14-cr-20561, ECF No. 30 (E.D. Mich. Dec. 8, 2020) (releasing man who had "recovered" from COVID); <u>United States v. Wilson</u>, No. 06-cr-338, 2020 WL 7024853, at *2 (N.D. Ohio Nov. 20, 2020) (releasing man who recovered from COVID due to likelihood of re-infection even though there was only one active COVID case in his facility); <u>United States v. Brownlee</u>, No. 14-cr-20562, 2020 WL 6118549, at *4 (E.D. Mich. Oct. 16, 2020) (releasing woman who "recovered" from COVID because "no convincing medical evidence yet exists to demonstrate that

---

[4] Press release available at:
https://www.bop.gov/resources/news/pdfs/20200917_press_release_bux.pdf.

she has any assurance of protective immunity" and because there were active COVID cases where she was housed); United States v. Davidson, No. 16-cr-00139, 2020 WL 4877255 (W.D. Pa. Aug. 20, 2020); United States v. Backstrom, No. 13-cr-20597, 2020 WL 4596820, at *3 (E.D. Mich. Aug. 11, 2020).

## C.  *Other § 3553(a) Factors Favor Release*

Mr. Sweet has had no disciplinary issues while in custody, and is currently housed at FCI Milan, a low-security facility.  He has a solid release plan.  He asks the Court to release him to a halfway house for the first 90 days of his term of supervised release, which will allow him to prepare for independent living.  Mr. Sweet will be financially secure, as he has a pension from Ford amassed during his nearly 40-year period of employment with the company.

There is no question that Mr. Sweet's offenses of conviction were extremely serious.  Importantly, he had no prior criminal history and has aged considerably since the time of his convictions.   This Court can put safeguards in place to ensure the safety of the community if a person is released.  United States v. Al-Jumail, No. 12-20272, 2020 WL 2395224, at *5 (E.D. Mich. May 12, 2020).  Further, this Court may still recognize that the original sentence was "just" while concluding "that the threat posed by COVID-19, in light of Defendant's underlying health conditions, constitutes an 'extraordinary and compelling reason' to modify his sentence under 18 U.S.C.

§ 3582(c)(1)(A)(I)." <u>United States v. Hunt</u>, No. 18-20037, 2020 WL 2395222 at *6 (E.D. Mich. May 12, 2020).

Upon considering all the circumstances, the Court should conclude that the more than thirteen years Mr. Sweet has served sufficient to satisfy the purposes of sentencing. <u>United States v. Sain</u>, No. 07-cr-20309, 2020 WL 5906167, at *6 (E.D. Mich. Oct. 6, 2020) ("The overarching § 3553 consideration is that in the end, the Court is to impose a sentence that is sufficient but not greater than necessary to accomplish the goals of sentencing.") (citing <u>Kimbrough v. United States</u>, 552 U.S. 85, 101 (2007)).  The most relevant personal characteristic is Mr. Sweet's health and COVID vulnerability. <u>See</u>, <u>United States v. Owdish</u>, No. 18-cr-20423, 2020 WL 4596822, at *4 (E.D. Mich. Aug. 11, 2020). His underlying conditions place him at high risk of severe illness or worse.

In addition, Mr. Sweet's lack of prison discipline shows that he can comply with strict rules.  See, Exhibit J – Discipline Record.  As another court in this district found in <u>United States v. Fields</u>, No. 12-cr-20274, ECF No. 50 (E.D. Mich. Dec. 8, 2020), the lack of misconducts evidences Mr. Sweet's respect for the law. *Id.* at PageID.335 ("The Court further finds that Defendant has demonstrated respect for the law by incurring no misconducts over his nine-plus years of incarceration."). Mr. Sweet's spotless institutional record is a testament to his ability and willingness to abide by rules and is a strong predictor of how he will perform on supervised release if his sentence is reduced.

The harsh conditions of Mr. Sweet's confinement since the COVID pandemic began sweeping through the BOP speak to the need "to provide just punishment[.]" 18 U.S.C.§ 3553(a)(2)(A). "The laborious nature of [incarceration during a COVID-19 outbreak] incarceration causes the §3553(a) factors to favor release before the defendant has served his []full sentence." <u>United States v. Little</u>, No. 18-cr-308, 2020 WL 2613034, at *2 (N.D.Ohio May 23, 2020); <u>see also United States v. Frew</u>, No. 18-cr-00340, 2020 WL 6440484, at *1 (N.D. Cal. Oct. 27, 2020) ("[C]onsidering all the section 3553(a) factors, including but not limited to the fact that Frew's conditions of confinement have been much harsher than anticipated . . . due to the pandemic, [release] is warranted."). Surely "just punishment" does not include a period of incarceration during which a susceptible man is exposed to a life-threatening virus.

Following Mr. Sweet's release, he will be supervised by the Probation Department for five years. Five years of supervised release "will assist him in his 'transition to community life' and 'fulfill[] rehabilitative ends.'" <u>United States v. Jones</u>, No. 94-cr-20079, 2020 WL 5359636, at *11 (N.D. Cal. Aug. 27, 2020) (quoting <u>United States v. Johnson</u>, 529 U.S. 53, 59 (2000)). Supervised release will limit Mr. Sweet's liberty interests, and he will face harsh consequences if he violates any condition of release. Additionally, he will be on parole to the Michigan Department of Corrections, allowing for extra supervision.

## V.      Conclusion

Roger Sweet respectfully requests compassionate release.  He asks that the Court reduce his term of imprisonment to a term of time-served, and permit him to begin his term of supervised release with an added condition that he be placed in a halfway house for 90 days following his release.

Respectfully Submitted,

**FEDERAL DEFENDER OFFICE**

s/ Nancy McGunn
613 Abbott Street, Suite 500
Detroit, Michigan  48226
313-967-5846
E-mail: nancy_mcgunn@fd.org
P55156

Date: February 16, 2020

---

### CERTIFICATE OF SERVICE

I certify that the foregoing document was filed this date using the CM/ECF system which will send notification to all parties of record.

s/Jennifer Mellas
Paralegal

---

18