**UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA, | Criminal No. 07-20369 |
| Plaintiff, | Honorable Victoria A. Roberts |
| v. | |
| ROGER JUNIOR SWEET, | |
| Defendant. | |

**RESPONSE AND OPPOSITION TO DEFENDANT'S MOTION
FOR COMPASSIONATE RELEASE**

On January 8, 2007, the house shared by Roger Junior Sweet and his wife Lizzie Mae Sweet was destroyed by fire. After putting out the fire, first responders found computers and electronic equipment stacked in a pile in the middle of the house. The fire was set on purpose. Although the house was damaged beyond repair, several computers and computer equipment survived the fire. On those devices, computer forensic experts discovered videos and images of the repeated sexual assaults by Roger Sweet of a 16 year-old developmentally disabled neighbor. Sweet's recorded rapes of this special needs child resulted in two convictions: one in the state for rape and the other before this Court for the production of child pornography. He was sentenced to 262 months in federal custody.

1

But those horrific facts tell only part of the story of Roger Sweet. No one ever saw Sweet's wife, Lizzie Mae, alive after the fire. As police looked into both the arson and the disappearance of Lizzie Mae, they took a closer look into the 1990 death of Sweet's first wife, Marlene. Sweet originally told authorities that Marlene died after falling in the bathroom; a more thorough autopsy revealed that she died from blunt force trauma. Roger Sweet was found guilty of the murder of Marlene and received a concurrent sentence to the rape and production of child pornography convictions. As for Lizzie Mae, her body was discovered six years later in a swampy area less than one mile from the Sweet home.

After serving about two-thirds of his sentence, Sweet now wants to be released from custody citing the Covid-19 epidemic. Sweet's motion fails for two reasons. First, he cannot establish extraordinary and compelling reasons because he has received the vaccine for Covid-19 and already recovered from the virus once. The chances Sweet contracts the virus again are remote. Second, even without the vaccine, Sweet's release is inconsistent with the sentencing factors found at 18 U.S.C. § 3553(a). Most obviously, releasing Sweet early disrespects the law, creates unwarranted sentencing disparities, avoids just punishment, and provides inadequate deterrence. Accordingly, his motion should be denied.

## BACKGROUND

### A. Sweet's Crimes

On January 8, 2007, a fire broke out at Sweet's residence at approximately 10:30 a.m. After the fire was extinguished by the Brownstown Fire Department, the fire chief began an investigation into the cause and origin of the fire. Notably, in a hallway of the burnt residence, computers, computer hardware components, and a camera were stacked together. The cables on the computers and hardware had been cut.

During the investigation into the fire, officers of the Brownstown Police Department ("BPD") learned that Sweet lived at the now-burned-out home with his wife, Lizzie Mae Collier-Sweet. Lizzie Mae had not been seen since the fire began and her best friend expressed concern about Lizzie Mae's welfare. The friend explained that Lizzie Mae was afraid of her husband, and that Defendant Sweet was involved with a mentally impaired girl who lives in the Sweets' neighborhood (hereinafter referred to as V-1). The detectives learned V-1's identity and subsequently interviewed her. V-1 indicated that Sweet had sexually assaulted her on multiple occasions in the Sweet home, dating back to before her eighteenth birthday. In interviews with law enforcement during the investigation, Sweet suggested that Lizzie Mae–whom Sweet was divorcing–probably set the fire and

3

"then went out in the woods and killed herself." As for why the cables on the computer would be cut, Sweet responded that he was "sure" Lizzie Mae did that as she did not like the fact that he spent a lot of time on the computer.

Sweet, though, admitted that he had sole access to the computer room and computers, even going so far as to lock the room to keep his wife out. As a result of the arson at the house, Lizzie Mae's disappearance, and the allegations of sexual abuse by V-1, BPD officers obtained several search warrants for the Sweet home and the computers. A forensic review of the computers and computer media revealed images of V-1 being sexually assaulted by Sweet, as well as images of child pornography. In total, the computer media at the Sweet house had more than one-half million images of child pornography, including more than 2500 images of children in bondage. There were also nearly 9,000 movies, including about 250 that contained children being bound. The forensic review also showed more than one thousand images of Sweet sexually exploiting V-1. Data on the movies and images revealed that the rapes of V-1, and their corresponding photographic memorialization, took place while she was 16 and 17 years of age.

Finally, the arson at the Sweet home and the subsequent disappearance of Lizzie Mae (who was never again seen alive) caused authorities in Oakland County to reexamine the suspicious death of Sweet's first wife, Marlene. Marlene Sweet

4

died in 1990 from head injuries which Defendant Roger Sweet claimed were the result of an accidental fall. The Oakland County medical examiner ruled Marlene Sweet's death a homicide, noting that the bruising on her body could not have come from a fall. Marlene and Roger Sweet's son testified that his father abused his mother frequently. Marlene's brother testified similarly.

On July 26, 2007, Sweet was indicted on four counts of Sexual Exploitation of Children (for producing child pornographic images of V-1 between July 1, 2004 and June 29, 2005), one count of receiving child pornography, and one count of possession of child pornography. He was also charged with Criminal Sexual Conduct by the Wayne County Prosecutor's Office for the offenses against V-1. As for the death of Marlene Sweet, the Oakland County Prosecutor's Office charged Sweet with open homicide.

On April 7, 2008, Sweet pleaded guilty to production and receipt of child pornography. Sweet's guilty plea was the result of plea negotiations between the various jurisdictions responsible for prosecuting his cases. Sweet was found guilty of murdering Marlene, raping V-1, and the federal child pornography charges. As part of the negotiated plea, the parties agreed that Sweet was to serve his various prison sentences concurrently with one another. This Court sentenced Sweet to 262 months in custody.

### B. Sweet's Time in Federal Prison

Although the various jurisdictions planned to have Sweet serve his 22 year sentence in federal custody, Sweet actually served part of his state sentence (about 12 years) before being transferred to federal custody. This Court, based on a stipulation from the parties, corrected that mistake and Sweet's amended judgment now accurately reflects the sentencing agreement. (ECF #33, PgID 152). Sweet arrived in federal custody, at the FCI Milan, in May 2019. Sweet contracted Covid-19 in April 2020, but has since recovered. (Exh. A, BOP Medical Records 2020 at 23, 29). In late January 2021, Sweet received the first shot of the Covid-19 Vaccine. (Exh. B, BOP Medical Records 2021 at 15).

On December 7, 2020, Sweet filed a pro se motion for compassionate release. (ECF #28 at PgID 125). Sweet's motion was supplemented by recently appointed counsel. (ECF #35 at PgID 162).

## ARGUMENT

Sweet's motion fails because he has not shown an "extraordinary and compelling" reason for his release, and the sentencing factors of 18 U.S.C. § 3553(a) do not justify his release.

6

### A. The Bureau of Prisons Has Responded Well to Covid-19

The Bureau of Prisons has taken significant steps to protect all inmates from Covid-19. Since January 2020, the Bureau of Prisons has implemented "a phased approach nationwide," implementing an increasingly strict protocol to minimize the virus's spread in its facilities. *Wilson v. Williams*, 961 F.3d 829, 833–34 (6th Cir. 2020). The Bureau of Prisons has also received nearly 50,000 doses of the Covid-19 vaccine as of February 24, 2021 and is distributing the vaccine it to its staff and inmates as quickly as it is received by each institution. *See* CDC Covid-19 Vaccine Tracker at www.cdc.gov/covid-data-tracker/#vaccinations (last visited Feb. 24, 2021). The Bureau of Prisons also continues to assess its entire population to determine which inmates face the most risk from Covid-19, pose the least danger to public safety, and can safely be granted home confinement. As of January 7, 2021, this process has already resulted in the BOP releasing at least 142 inmates who were sentenced in the Eastern District of Michigan. Especially given the Bureau of Prisons' efforts—and "the legitimate concerns about public safety" from releasing inmates who might "return to their criminal activities," *Wilson*, 961 F.3d at 845— the Court should deny Sweet's motion for compassionate release.

7

*Bureau of Prisons Efforts Within Their Facilities*

The Bureau of Prisons has reacted quickly to confront Covid-19's spread within its facilities. *Wilson*, 961 F.3d at 833–34. For almost a decade, the Bureau of Prisons has maintained a detailed protocol for responding to a pandemic. Consistent with that protocol, the Bureau of Prisons began planning for Covid-19 in January 2020. *Wilson*, 961 F.3d at 833–34. At the outset of the pandemic, the Bureau of Prisons started modifying its operations to implement its Covid-19 Action Plan and minimize the risk of Covid-19 transmission into and inside its facilities. *Id.*; *see* BOP Covid-19 Modified Operations Website. Since then, as the worldwide crisis has evolved, the Bureau of Prisons has repeatedly revised its plan. *Wilson*, 961 F.3d at 834. To stop the spread of the disease, the Bureau of Prisons has restricted inmate movement within and between facilities. *Id.* When new inmates arrive, asymptomatic inmates are placed in quarantine for a minimum of 14 days. *Id.* Symptomatic inmates are provided with medical evaluation and treatment and are isolated from other inmates until testing negative for Covid-19 or being cleared by medical staff under the CDC's criteria. *Id.*

Within its facilities, the Bureau of Prisons has "modified operations to maximize physical distancing, including staggering meal and recreation times, instating grab-and-go meals, and establishing quarantine and isolation procedures."

8

Id. Staff and inmates are issued face masks to wear in public areas. *See* BOP FAQs: Correcting Myths and Misinformation. When visitation is permitted at an institution, the visits are non-contact, require masks, and social distancing between inmates and visitors is enforced, either via the use of plexiglass (or similar barriers), or physical distancing (i.e., six feet apart). Visitors are screened for Covid-19 symptoms and their temperature is checked. Visitors who are sick or symptomatic are not allowed to visit, and inmates in quarantine or isolation cannot participate in social visiting. *See* BOP Modified Operations. But to ensure that relationships and communication are maintained throughout this disruption, the Bureau of Prisons has increased inmates' telephone allowance to 500 minutes per month, and legal visits are accommodated upon request. *See* BOP Modified Operations.

Like all other institutions, penal and otherwise, the Bureau of Prisons has not been able to eliminate the risks from Covid-19 completely, despite its best efforts. But the Bureau of Prisons' measures will help federal inmates remain protected from Covid-19 and ensure that they receive any required medical care during these difficult times.

*BOP Has Increased the Number of Inmates Eligible for Home Confinement*

The Bureau of Prisons has responded to Covid-19 by increasing the placement of federal prisoners in home confinement. Legislation now temporarily permits the

9

Bureau of Prisons to "lengthen the maximum amount of time for which [it] is authorized to place a prisoner in home confinement" during the Covid-19 pandemic. Coronavirus Aid, Relief, and Economic Security Act (CARES Act) § 12003(b)(2), Pub. L. No.116-136, 134, Stat.281, 516 (Mar. 27, 2020). The Attorney General has also issued two directives, ordering the Bureau of Prisons to use the "various statutory authorities to grant home confinement for inmates seeking transfer in connection with the ongoing Covid-19 pandemic." (March 26, 2020, Directive to BOP at 1; April 3, 2020, Directive to BOP at 1). The directives require the Bureau of Prisons to identify the inmates most at risk from Covid-19 and "to consider the totality of circumstances for each individual inmate" in deciding whether home confinement is appropriate. (March 26, 2020, Directive to BOP at 1).

The Bureau of Prisons' efforts demonstrate measurable results. Over 7,680 federal inmates have been granted home confinement since the Covid-19 pandemic began. As the Attorney General's directives have explained, these home-confinement decisions have required evaluating several criteria:

1.) Each inmate's age and vulnerability to Covid-19;

2.) Whether home confinement would increase or decrease the inmate's risk of contracting Covid-19; and

10

3.) Whether the inmate's release into home confinement would risk public safety. (Mar. 26, 2020, Directive to BOP at 1; April 3, 2020, Directive to BOP at 1).

These criteria make sense and fit the realities of the Covid-19 pandemic far better than any other solution does. The Bureau of Prisons cannot open its facilities' gates indiscriminately and unleash convicted criminals. It must focus on the inmates who have the highest risk factors for Covid-19 and are least likely to engage in new criminal activity. This is true not just to protect the public generally, but to avoid the risk that a released defendant will bring Covid-19 back into the jail or prison system if he violates his terms of release or is caught committing a new crime. *See* 18 U.S.C. § 3624(g)(5); 34 U.S.C. § 60541(g)(2). The Bureau of Prisons' home-confinement initiative thus appropriately focuses on the inmates who will most benefit from release and whose release is least risky.

Finally, the Bureau of Prisons' home-confinement initiative allows it to marshal and prioritize its limited resources for the inmates and circumstances that are most urgent. For any inmate who is a candidate for home confinement, the Bureau of Prisons must, among many other considerations, assess the probation department's reduced ability to supervise inmates who have been released. These decisions require channeling resources to the inmates who are the best candidates for release.

11

These types of system-wide resource-allocation decisions are difficult even in normal circumstances. That is why Congress tasked the Bureau of Prisons to make them and has not subjected the decisions to judicial review. 18 U.S.C. § 3621(b) ("Notwithstanding any other provision of law, a designation of a place of imprisonment under this subsection is not reviewable by any court."); *United States v. Patino,* No. 18- 20451, 2020 WL 1676766, at *6 (E.D. Mich. Apr. 6, 2020) ("[A]s a general rule, the Court lacks authority to direct the operations of the Bureau of Prisons."). It is especially true now given the Bureau of Prisons' substantial and ongoing efforts to address the Covid-19 pandemic.

*FCI Milan*

Sweet is currently incarcerated at FCI Milan. No inmates at Milan have Covid-19, and just 5 staff members have the virus, according to the BOP website. https://www.bop.gov/coronavirus/. Sweet is one of the fortunate people at the facility who has received the Covid-19 vaccine. (Exh. B: BOP Medical Records 2021 at 15).

**B. Sweet's Motion for Compassionate Release Fails**

Sweet's motion for a reduction in sentence to time served should be denied. A district court has "no inherent authority . . . to modify an otherwise valid sentence." *United States v. Washington*, 584 F.3d 693, 700 (6th Cir. 2009). Rather, a district

12

court's authority to modify a defendant's sentence is "narrowly circumscribed." *United States v. Houston,* 529 F.3d 743, 753 n.2 (6th Cir. 2008). Absent a specific statutory exception, a district court "may not modify a term of imprisonment once it has been imposed." 18 U.S.C. § 3582(c). Those statutory exceptions are narrow. *United States v. Ross,* 245 F.3d 577, 586 (6th Cir. 2001). Compassionate release under 18 U.S.C. § 3582(c)(1)(A) is equally narrow, requiring all of the following: (1) exhaustion of administrative remedies; (2) an extraordinary and compelling reason for release; and (3) evaluation of the section 3553(a) factors that favor detention.

*Sweet Exhausted Administrative Remedies*

Compassionate release requires administrative exhaustion. If a defendant moves for compassionate release under 18 U.S.C. §3582(c)(1)(A), the district court may not act on the motion unless the defendant files it after either completing the administrative process within the Bureau of Prisons or waiting 30 days from when the warden at his facility received his request. 18 U.S.C. § 3582(c)(1)(A). This requirement is mandatory. *See United States v. Alam*, 960 F.3d 831, 832 (6th Cir. 2020). Sweet filed a request with the warden in December 2020, and therefore has met the requirement that he exhaust administrative remedies.

13

*Sweet Has Not Shown Extraordinary and Compelling Reasons for Release*

Even if a defendant exhausts his administrative remedies, he must show "extraordinary and compelling reasons" for compassionate release. 18 U.S.C. § 3582(c)(1)(A). Sweet is almost 73 years old. He also has Stage 1 kidney disease. (Exh. B, BOP Medical Records 2021 at 12-13). For these reasons, Sweet would typically be at an increased risk for "severe illness from Covid-19" under the CDC guidelines. *See* https://www.cdc.gov/coronavirus/2019. Ordinarily, the government would agree that Sweet has met the burden of showing "extraordinary and compelling" reasons for release due to his increased risk for severe illness.

However, two facts defeat Sweet's claim of "extraordinary and compelling" reasons for his release. First, Sweet has been vaccinated. The Moderna vaccine is 94% effective. https://www.mayoclinic.org/diseases-conditions/coronavirus/in-depth/coronavirus-vaccine/art-20484859#had-covid (last visited on March 2, 2021). Second, Sweet has already contracted and recovered from Covid-19. According to the CDC, it is "rare" for someone who has already recovered from Covid-19 to contract it again. https://www.cdc.gov/coronavirus/2019-ncov/vaccines/facts.html ("Even if you have already recovered from COVID-19, it is possible—although rare—that you could be infected with the virus that causes COVID-19 again.") (last visited on March 2, 2021). Taken together, Sweet's prior recovery from the virus

14

coupled with his vaccination make the likelihood of him recontracting the disease extremely unlikely. Accordingly, he fails to adequately show an extraordinary and compelling reason for his release.

*The § 3553(a) Factors Strongly Weigh Against Sweet's Release*

Even if Sweet could show "extraordinary and compelling reasons" for his release, the Court must still weigh the sentencing factors set forth in 18 U.S.C. § 3553(a) and determine whether release is appropriate. *See* 18 U.S.C. § 3582(c)(1)(A). Those familiar factors include the guidelines range, nature and circumstances of the offense, the defendant's history and characteristics, the seriousness of the offense, the need to promote respect for the law and provide just punishment for the offense, general and specific deterrence, and the protection of the public. 18 U.S.C. §3553(a).

*The Guidelines Range*: The advisory guidelines range in this case called for a sentence of 262-327 months in prison. Sweet received a bottom-of-the-guidelines-range sentence, and has served only 2/3 of his term. The sentencing guidelines favor denying Sweet's motion.

*The nature and circumstances of the offense.* The nature and circumstances of the offense are shocking. Sweet preyed upon a vulnerable, special needs victim in his neighborhood. Sweet raped this child on multiple occasions over the course of a

15

year. Sweet's desire to relive those experiences by recording the sexual assaults further victimized this child. Moreover, Sweet had over a half a million other images of child pornography, and had a particular affinity for children being bound. Sweet has a violent sexual interest in children.

Thus, the nature and circumstances of the offense counsel against Sweet's release.

*The history and characteristics of the offender.* So too does Sweet's character. In 1990, Sweet murdered his first wife, Marlene, and got away with it for nearly two decades. In 2007, when his new wife, Lizzie Mae, went missing after an arson at the Sweet home, police learned how much she feared her husband. According to one news report, "Police said they found evidence of foul play in the home and Collier-Sweet's diary where she revealed that she was scared of her husband—fearing him so much that she slept on the couch next to a hammer and a shotgun." *Skull Found Belongs to Woman Missing 6 Years*, https://detroit.cbslocal.com/2013/03/28/skull-found-identified-as-that-of-missing-lizzie-sweet/ (last visited March 2, 2021). The autopsy on Lizzie Mae came back "indeterminate" as to cause of death, but her remains were found in a marshy area less than one mile from the Sweet home. *Lizzie Mae Collier-Sweet Autopsy Indeterminate: Brownstown Township Woman Had Been Missing Since 2007,* https://www.clickondetroit.com/news/2013/05/24/lizzie-

16

mae-collier-sweet-autopsy-indeterminate. Nothing about Sweet's history and characteristics—which include rape, murder, and the suspicious circumstances surrounding Lizze Mae's death—support releasing him early.

*The Purposes of Sentencing.* Allowing Sweet to walk free after serving less than his full term of imprisonment would promote disrespect for the law, would not amount to just punishment, and would not reflect the seriousness of the offense. Sweet received concurrent sentences as part of a global plea agreement resolving the murder of Marlene and the rapes of his neighbor. It is unclear how those cases would have been resolved had those jurisdictions knew that Sweet would possibly be released from federal custody after serving just two-thirds of his sentence. To faithfully honor the deal entered into between the Wayne County Prosecutor's Office, the Oakland County Prosecutor's Office, and the U.S. Attorney's Office, the government respectfully requests that the Court deny Sweet's motion.

*Avoiding Unwarranted Sentencing Disparities.* Finally, releasing Sweet prior to him serving even 15 years in custody would result in significant sentencing disparities among like offenders. Section 3553(a)(6) says the sentence should "avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." Even the least culpable defendant convicted of producing child pornography receives a mandatory minimum 15-year sentence.

17

*See* 18 U.S.C. § 2251. But Sweet is not the least culpable of such offenders. He repeatedly sexually assaulted the victim in this case, collected hundreds of thousands of images of child pornography, and murdered his first wife. The scope of the destruction caused by Sweet cannot be overstated. When comparing him to other producers of child pornography—virtually all of which do not have a conviction for murder on their record—Sweet cannot be seen as among the least culpable. To avoid unwarranted sentencing disparities, Sweet's motion for compassionate release should be denied.

## CONCLUSION

For all of the foregoing reasons, the United States respectfully requests that Defendant Sweet's motion be denied.

>Respectfully submitted,
>
>SAIMA S. MOHSIN
>Acting United States Attorney
>
>*s/ Kevin M. Mulcahy*
>KEVIN M. MULCAHY
>Assistant United States Attorneys
>211 West Fort Street, Suite 2001
>Detroit, MI 48226
>(313) 226-9713

Dated: March 2, 2021

**CERTIFICATE OF SERVICE**

    I hereby certify that on March 2, 2021 I electronically filed the foregoing document with the Clerk of the Court using the ECF system, which will provide notice and a copy to Sweet's attorney.

    s/*Kevin M. Mulcahy*
KEVIN M. MULCAHY
Assistant United States Attorney
211 West Fort Street, Suite 2001
Detroit, Michigan 48226-3211
(313) 226-9713
Kevin.Mulcahy@usdoj.gov